# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

Robert Leroy Moore,      )
      Petitioner,      )
      )
v.      )      1:17cv1415 (CMH/JFA)
      )
Harold W. Clarke,      )
      Respondent.      )

## MEMORANDUM OPINION

Robert Leroy Moore, by counsel, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his pandering and attempted pandering convictions in the Circuit Court of Fairfax County. Respondent filed a Motion to Dismiss and Rule 5 Answer, along with a supporting brief and exhibits. Dkt. No. 5-7. Petitioner filed a Reply. Dkt. No. 8. For the reasons that follow, respondent's Motion to Dismiss will be granted, and the petition will be dismissed, with prejudice.

## I. Background

Petitioner is detained pursuant to a final judgment of the Circuit Court of Fairfax County, entered April 8, 2015. Case Nos. FE-2014-1161, 1168. Petitioner entered an Alford plea and was found guilty of one count of pandering, in violation of Virginia Code § 18.2-357, and one count of attempted pandering, in violation of Virginia Code §§ 18.2-357, 18.2-26. Id. Petitioner was sentenced to fifteen years imprisonment, with five years suspended. Id. Petitioner filed a Motion to Withdraw his Plea on April 28, 2015, which was denied by order dated the same day. Id.

Petitioner pursued a direct appeal to the Court of Appeals of Virginia and his convictions were affirmed. Record No. 0706-15-4. On direct appeal, the Court of Appeals of Virginia found the underlying facts of the case to be the following.

> In May of 2014, [petitioner] met A.R. at the store where he worked. A.R., then twenty-two years old, had been declared mentally incapacitated by a circuit court order and her parents had been appointed as guardians. She was adopted from Russia and suffers from post-traumatic stress disorder and other ailments originating in childhood. She also has a very low I.Q.
>
> [Petitioner's] relationship with A.R. began as flirtations and ultimately developed into a sexual one. [Petitioner] told A.R. that he needed money and that she could help him. As a result, from May 8 through May 20, 2014, [petitioner] took A.R. to a hotel where she would engage in acts of prostitution with others. [Petitioner] received the proceeds from these transactions.
>
> In time, A.R.'s parents became suspicious and discovered A.R.'s picture in an advertisement for escort services. They contacted their local police department, and the officers responded to A.R.'s advertisement in an undercover capacity. While undercover, Detective Fox learned that A.R. had been prostituting for appellant, who told her what prices to charge, drove her to all her appointments, and kept all of the money she earned.
>
> [Petitioner] was arrested and initially denied that he was involved with any prostitution. He then claimed that he and A.R. were boyfriend and girlfriend. A subsequent search of his cell phone and text communications reveled that he communicated nightly with A.R. through test messages regarding the need to make money and what to charge for specific sexual acts.

Id. The Supreme Court of Virginia subsequently refused his petition for appeal. Record No. 161213.

While pursuing his direct appeal petitioner filed a Second Motion to Reconsider Sentence in the trial court.[1] Case Nos. FE-2014-1161, 1168. In that motion, petitioner presented new evidence; the same evidence he uses to support the instant petition. Id. Petitioner's motion for reconsideration was denied by the trial court by order dated March 14, 2016. Id. In denying the motion, the trial court stated, in part, that

---

[1] Petitioner had filed a first motion to reconsider which had been denied.

> [e]ven if [petitioner] could prove [A.R.] engaged in prostitution both before meeting [petitioner] and after [petitioner] went to jail, it would not alter the Court's judgment that [petitioner's] conduct was extraordinarily predatory, that he used intimidation and coercion to achieve his objectives, that [A.R.] was an especially vulnerable victim due to her mental illness and limited mental capacity, that the [petitioner's] misconduct had a devastating impact on the victim, and that [petitioner] came before the Court with an extensive and violent criminal history.

Id. Petitioner then filed a writ of habeas corpus in the Supreme Court of Virginia.

Record No. 160684. The state habeas petition was dismissed on May 8, 2017. Id.

On December 11, 2017, petitioner filed the instant federal petition, wherein he challenges his convictions. Specifically, he alleges the following.

> I. Trial counsel was ineffective for failing to investigate the actual relationship between [petitioner] and [A.R.] and [A.R.]'s previous prostitution. [Petitioner] was prejudiced either because he would not have entered a plea had all the facts been readily available or because the evidence would have resulted in a lesser sentence.
>
> II. [Petitioner's] plea was involuntary, because his trial counsel deprived him of any evidence about his case until more than a month after his plea hearing.
>
> III. [Petitioner's] trial counsel was constitutionally ineffective because there was an actual conflict in this case that adversely hurt trial counsel's performance, and thus prejudiced [petitioner].

Dkt. No. 1.

## II. Standard of Review

### A. Review on the Merits

The proper standard of review depends on whether the state habeas court's decision was an adjudication on the merits. "For AEDPA's deferential standard to apply to the state post-conviction-relief court's dismissal of these claims, the court's decision must qualify as an 'adjudication on the merits' under § 2254(d); otherwise, de novo review is proper. Whether a claim has been adjudicated on the merits is a case-specific inquiry ...." Morva v. Zook, 821 F.3d 517, 527 (4th Cir. 2016) (internal quotation marks, citations, and alterations omitted). "A claim

is not 'adjudicated on the merits' when the state court makes its decision on a materially incomplete record. A record may be materially incomplete when a state court unreasonably refuses to permit further development of the facts of a claim." Gordon v. Braxton, 780 F.3d 196, 202 (4th Cir. 2015) (internal quotation marks and citations omitted).

Petitioner asserts that the state habeas court's decision was not an adjudication of the merits because it was made on a materially incomplete record. Petitioner later makes the conclusory allegation that the state habeas court truncated the factual development of the record by denying his requests for discovery and an evidentiary hearing, despite his newly presented evidence. Petitioner's conclusory allegation that the state habeas court did not allow him to develop the facts of his claims further is insufficient. In addition, the record does not establish that the state habeas court ignored any of petitioner's evidence. See Morva, 821 F.3d at 528 ("Although the Supreme Court of Virginia precluded some factual development as to counsel's investigative decisionmaking, the court did not act unreasonably. The record was substantial and contained sufficient evidence to answer the Strickland inquiry.").

Later in the petition, petitioner argues that there were factual disputes that needed development through an evidentiary hearing. Specifically, petitioner argues that the state habeas court (1) improperly determined that A.R.'s friend's testimony did not establish that this friend knew A.R. was engaged in prostitution prior to meeting petitioner; (2) improperly determined that A.R.'s brother repudiated testimony favorable to petitioner; and (3) treated one affiant's testimony "with inappropriate skepticism." Pet. at 28-29.

Petitioner's examples are not of facts in dispute, rather, they are examples of why petitioner believes the state habeas court unreasonably determined the facts in light of the evidence presented. Petitioner admits as much since he lists these same examples as reasons

4

why the state court unreasonably determined the facts before it. Pet. at 27. Therefore, the state habeas court decision was not made on a materially incomplete record and it was a decision on the merits.

Petitioner also claims that the state habeas court's decision is not entitled to deference because the lack of an evidentiary hearing made the process employed by the state court defective. However, he provides no law to support this specific claim and the Court has not found any legal support for this argument. Therefore, the state court's decision is entitled to deference because it was a decision on the merits and the process employed by the state court was not defective.

When a state court has addressed the merits of a claim raised in a federal habeas corpus petition, a federal court may not grant the petition on that particular claim unless the state court's adjudication was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts presented at the trial. 28 U.S.C. § 2254(d)(1)-(2). This test erects a "formidable barrier to federal habeas relief" for claims adjudicated on the merits. Burt v. Titlow, 134 S. Ct. 10, 16 (2013). Under this standard, for a state prisoner to obtain habeas relief, he "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

The evaluation of whether a state court decision is "contrary to" or "an unreasonable application of" federal law is based upon an independent review of each standard. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court determination violates the "contrary to" standard if it "arrives at a conclusion opposite to that reached by [the United States Supreme]

5

Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Id. at 413.

Under the "unreasonable application" clause, the writ should be granted if the federal court finds that the state court "identifies the correct governing legal principle from [the United States Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court should review the state court determination with deference; a federal court cannot grant the writ simply because it concludes that the state court incorrectly applied the legal standard. Woodford v. Visciotti, 537 U.S. 19, 24 (2002). Rather, "the federal habeas scheme ... authorizes federal court intervention only when a state-court decision is objectively unreasonable." Id. at 27.

In determining whether the state court's decision was based on an unreasonable determination of the facts presented at the trial, a federal court reviewing a habeas petition "presume[s] the [state] court's factual findings to be sound unless [petitioner] rebuts 'the presumption of correctness by clear and convincing evidence.'" Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. 2254(e)(1)); see, e.g., Lenz v. Washington, 444 F.3d 295, 300-01 (4th Cir. 2000). "The Supreme Court has found state factual findings unreasonable under § 2254(d)(2) when the direction of the evidence, viewed cumulatively, was 'too powerful to conclude anything but [the petitioner's factual claim],' and when a state court's finding was 'clearly erroneous.'" Landers v. Warden, Atty. Gen. of Ala., 776 F.3d 1288, 1294 (11th Cir. 2015) (quoting Miller–El, 545 U.S. at 265, and Wiggins v. Smith, 539 U.S. 510, 528–29 (2003)).

### B. Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must meet the two-pronged test established in Strickland v. Washington, 466 U.S. 668 (1984). Under this test, a

petitioner must prove both that his attorney's performance was so deficient "that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and that this performance prejudiced the outcome of petitioner's trial. Strickland, 466 U.S. at 687. To meet the second prong, petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The two prongs, deficient performance and prejudice, constitute "separate and distinct elements." Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). Therefore, a court can appropriately dismiss an ineffective assistance of counsel claim on either prong. Strickland, 466 U.S. at 697; see also Bell v. Cone, 535 U.S. 685, 695 (2002) (internal citations omitted) ("Without proof of both deficient performance and prejudice to the defendant, we concluded it could not be said that the sentence or conviction resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable, and the sentence or conviction should stand."). A court reviewing a claim of ineffective assistance of counsel must presume that counsel acted competently, and should determine the merits of the claim based on the information available to the attorney at the time of the trial. See, e.g., Bell, 535 U.S. at 695; Burket v. Angelone, 208 F.3d 172, 189 (4th Cir. 2000).

The Strickland test also "applies to challenges to guilty pleas based on ineffective assistance of counsel." Hill v. Lockhart, 474 U.S. 52, 58 (1985). With regard to the "prejudice" prong in the context of a guilty plea, a petitioner must show that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; see also Burket, 208 F.3d at 190.

### III. Analysis

#### A. Claim I

In his first claim, petitioner argues that trial counsel was ineffective for failing to investigate the actual relationship between petitioner and A.R., as well as A.R.'s alleged prostitution both before and after her relationship with petitioner.[2] As to A.R.'s alleged prostitution before and after her relationship with petitioner, petitioner states that a proper investigation would have revealed several witnesses, including A.R.'s brother, Alexander, A.R.'s friend, Isabella Vasquez, and another individual, Anthony Fulton, who would testify that A.R. was engaged in prostitution prior to meeting petitioner and after petitioner was incarcerated. Pet. at 24-26. Each of these individuals, except Fulton, were known to trial counsel prior to petitioner pleading guilty, but trial counsel did not interview them. Id. at 25.

Petitioner also claims that trial counsel did not investigate, by asking petitioner, what certain text messages sent between petitioner and A.R. meant. Id. at 25. Petitioner asserts that, because the trial court relied on these text messages, when sentencing petitioner, as evidence that petitioner was taking advantage of A.R., trial counsel should have investigated their true meaning. Id. Petitioner contends that the text messages reveal A.R.'s drug use and were "incredibly ambiguous as to meaning." Id. Without proper investigation, petitioner asserts, he was unable to rebut the Commonwealth's narrative of the case. Id.

Petitioner claims that, if he "had known of the information presented in post-conviction prior to pleading guilty, there is a reasonable probability that he would have chosen to go to trial

---

[2] The Court notes that it finds it disingenuous, at best, that in asserting that trial counsel's failure to investigate his relationship with A.R. prejudiced him, he argues that he "was as equally as low functioning as A.R.," Pet.'s Response at 2, who was deemed incompetent by a court, while also arguing that he did not need the "small amount of income earned by [A.R.]" because he earned enough income from running two separate companies, Pet. at 17.

or received a lesser sentence." Id. at 26. In addition, petitioner argues, had trial counsel performed a proper investigation, petitioner would have received a lesser sentence. Id. at 27.

The state habeas court rejected these arguments for the reasons stated below.

[P]etitioner contends he was denied the effective assistance of counsel because, prior to petitioner's sentencing, counsel failed to investigate and discover evidence that A.R. was engaged in prostitution before she met petitioner and continued her prostitution after petitioner was incarcerated. In support of this claim, petitioner refers to the "Declarations" of Isabella Vasquez, Anthony Fulton, and A.R.'s brother, Alexander, which were submitted to the trial court in support of petitioner's second motion for reconsideration of his sentence. Petitioner's counsel was aware of Alexander and Vasquez but did not interview them and would have been aware of Fulton if counsel had asked petitioner's former roommate "for contacts that would know [A.R.] was a prostitute." … Petitioner argues that, but for counsel's failure, he would have received a much lesser sentence. Petitioner contends the trial court sentenced petitioner harshly because it found his actions were "extraordinarily predatory," that he "sold [A.R.] for sex," and that there was no evidence to support petitioner's claim that the prostitution was A.R.'s idea and that petitioner was simply facilitating it. The court noted numerous texts between petitioner and A.R. showed petitioner told A.R. what to charge and what to wear and drove her to her appointments. The court further noted A.R. had given all the money she earned from prostitution to petitioner. Evidence that A.R. was engaged in prostitution before she met petitioner and continued her prostitution after petitioner was incarcerated would have mitigated these findings.

The Court holds this [claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984). The record, including petitioner's second motion to reconsider, the attached declarations and police reports, the response to the second motion to reconsider, the trial court's order denying the motion, the trial and sentencing transcripts, and the manuscript record, demonstrates that neither Vasquez' declaration nor the report of her interview with the police suggest she had any knowledge that A.R. was engaged in prostitution prior to meeting petitioner. The purported declaration of Alexander states that he believed A.R.'s child, who was born prior to A.R. meeting petitioner, was the result of A.R.'s prostitution. This declaration, however, was not authored by Alexander, but by petitioner's private investigator, was never signed by Alexander, and was, in fact, repudiated by him.

Fulton's declaration, authored over a year and a half after the instant offenses, indicates he has known A.R. for four years, though he has only seen her a few times. At unspecified times during those four years, he claims to have heard A.R. talking about going on "dates," which he inferred meant "prostitution

9

appointments." Fulton states A.R. dresses like he thinks a prostitute would dress, and that it is "common knowledge" that A.R. is a prostitute and has been for four years. Fulton further states he has texts, photos, and videos which would prove A.R. has engaged in prostitution since petitioner's incarceration. He includes a text message, purportedly from A.R. to Fulton, asking how much she should charge Fulton's "friend" for her time.

A.R. is a Russian orphan who was adopted when she was seven. As a result of significant abuse suffered and observed by A.R. before she was adopted, she has been hospitalized three times for mental illness, has been in two residential therapeutic programs, and was unable to attend a regular school. She suffers from major depressive disorder, posttraumatic stress disorder, and reactive attachment disorder, among other illnesses. In addition, A.R. has borderline intellectual functioning and has been declared by a court to be an incapacitated person. In her twenties, A.R. lives with her parents, who are her legal guardians. Given A.R.'s severe limitations, the proffered evidence that A.R. is currently engaged in prostitution, rather than suggesting she was more culpable than petitioner, suggests Fulton is now preying upon her in petitioner's stead. Further, Fulton's assumptions regarding A.R.'s "dates" and the manner of her dress and the third-hand "common knowledge" he offers are nothing more than gossip and innuendo, insufficient to demonstrate A.R. was engaged in prostitution before she met petitioner or to mitigate, in any way, petitioner's culpability.

***

In addition, the trial court considered these declarations and reports in rejecting petitioner's second motion for reconsideration. In doing so, the court expressly stated that, even if petitioner could prove A.R. engaged in prostitution prior to meeting petitioner and after his incarceration, it would not alter the court's judgment that petitioner's actions were "extraordinarily predatory, that he used intimidation and coercion to achieve his objectives, [and] that [A.R.] was an especially vulnerable victim" upon whom petitioner's conduct "had a devastating impact." Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (I), petitioner contends he was denied the effective assistance of counsel because, prior to sentencing, counsel failed to discuss with petitioner the meaning of text messages between petitioner and A.R. These text messages were admitted at sentencing and were construed by the prosecutor and the trial court to show petitioner pushed A.R. to prostitute herself to obtain money for petitioner and told A.R. how much to charge for sex acts and what to wear. Petitioner contends if counsel had asked him, he would have explained that when A.R. asked him what kind of shoes to wear it was not because she was uncertain what kind of shoes he wanted her to wear while prostituting himself [sic], but because they were going to a barbeque hosted by one of petitioner's friends.

Similarly, when petitioner texted A.R. to "[m]ake it, Babe, quick. We've got one more in 20 minutes," it was because they needed to catch a train in 20 minutes to Washington D.C., where they intended to socialize with friends. When he texted her "We got to get money tonight babe," he only meant they needed to stop at an A.T.M., not that they needed to make money from prostitution.

The Court holds this portion of claim (I) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. The record, including the text messages between A.R. and petitioner from May 8, 2014 to May 21, 2014, which were admitted at sentencing as Commonwealth Exhibit 1, demonstrates that on May 9, 2014, A.R. texted petitioner, asking what time he wanted her to "get ready." Petitioner responded "[a]t 5." A.R. next asked if she was "Woking" [sic] and what kind of shoes she should wear, flip flops or high heels. Petitioner told her to bring both. Over the next several hours, there are numerous texts between petitioner and A.R., which include A.R. asking petitioner to explain a particular sex act and how much she should charge for it, and A.R. informing petitioner she will be with someone for an hour and petitioner responding "OK 250." Under the circumstances, it is unlikely the trial court would have believed petitioner and A.R. were at a barbeque that evening.

Petitioner's text to A.R. "[m]ake it, Babe, quick. We've got one more in 20 minutes," was made at 1:57 a.m. on May 17, 2014. This text was followed by two texts at 3:47 a.m. stating "15 minutes only ... be done by 3:58" and "Make it quick." The proceeding day, petitioner had texted A.R. asking her "come back out ... we got to get money." He subsequently texted her demanding that she answer her phone and reminding her they had "to get the Room by 3 or they are going to cancel the room." Under the circumstances, it is unlikely the trial court would have believed petitioner and A.R. were attempting to catch a train to D.C. at 1:57 a.m. to socialize with friends.

Finally, petitioner texted A.R. "We got to get money tonight babe OK," on May 10, 2014. Even if he only meant they needed to stop at an A.T.M. on that occasion, petitioner repeatedly told A.R. they needed to get money, informed her how much to charge for various acts and times, demanded that she collect the money first, and cursed at her when she was late or did not respond to him quickly enough. Thus, even if the trial court had accepted petitioner's innocent explanation for this text, petitioner cannot show it would in any way have mitigated his actions. Therefore, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

In another portion of claim (I), petitioner contends he was denied the effective assistance of counsel because, prior to sentencing, counsel failed to investigate petitioner's relationship with A.R. Petitioner contends A.R. manipulated, used and abused him. Petitioner alleges Alexander would have testified A.R.

controlled petitioner and physically assaulted him when he asked her to stop prostituting. In addition, petitioner alleges A.R. once slapped him several times after she saw that another woman was listed as "My Love" in his cell phone contacts. Petitioner further appears to allege his relationship with A.R. was more committed than the prosecution suggested because he had been dating her for several weeks prior to his arrest and had met her parents.

The Court holds that this portion of claim (I) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland. The record, including the trial and sentencing transcripts, petitioner's second motion for reconsideration and attached exhibits, and the Commonwealth's response and attached exhibits, demonstrates Alexander's declaration states that he witnessed A.R. being physically, verbally, and emotionally abusive and manipulative of petitioner. This declaration, however, was not authored or signed by Alexander and has been repudiated by him.

In addition, petitioner repeatedly lied to police about his relationship to A.R., first claiming they were only friends, then admitting they were romantically involved but denying any involvement in prostitution, then admitting he had driven her to one appointment before admitting he regularly drove her, and denying he had received any of her earnings before admitting he had been "reimbursed" for expenses. The text messages between them clearly show A.R. believed petitioner loved her and just as clearly show petitioner telling A.R. what to wear and how much to charge and demanding that she "get money first." Under the circumstances, even if the trial court had credited petitioner's claim that A.R. slapped him upon learning petitioner was calling another woman "My love," petitioner cannot show it would have mitigated the offenses and altered petitioner's sentence.

In addition, A.R.'s mother testified she was aware A.R. began dating petitioner after they met at the grocery store. A.R. and her mother were shopping and petitioner worked at the store and helped them find something. A.R.'s mother testified that was the last time she spoke with petitioner. She further explained she and her husband became concerned about A.R.'s relationship with petitioner because A.R. was spending so much time with petitioner and "we didn't know him and didn't know if she was safe." Further, there were several text messages between A.R. and petitioner declaring their love for each other. Thus, the trial court was made aware of the romantic relationship between petitioner and A.R. The mother's testimony, however, belies petitioner's apparent suggestion that he had developed any sort of relationship with A.R.'s parents. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

Record No. 160684.

### i. Unreasonable Determination of the Facts[3]

Petitioner argues that the state habeas court's decision was based on an unreasonable determination of the facts for the following reasons. First, petitioner claims that the state habeas court's finding that nothing in the record established that Vasquez knew that A.R. engaged in prostitution prior to meeting petitioner was unreasonable based on Vasquez's declaration. Pet. at 28. Vasquez submitted a declaration stating that, in May 2014, she was in a hotel room with A.R. and petitioner. Dkt. No. 7-1, Vasquez Decl. This was the only time Vasquez met petitioner. Id. At a certain point, A.R. stated that "she enjoyed being a prostitute, and made a lot of money as a prostitute." Id. Vasquez also stated that, when petitioner was absent from the hotel room, A.R. spoke "on her cell phone with several men, attempting to schedule prostitution appointments. [A.R.] also asked [Vasquez] if [she] wanted to start prostituting. When [petitioner] returned, [Vasquez] heard him offer to take [A.R.] to a prostitution appointment." Id. Vasquez went on to state that petitioner never asked if she wanted to be a prostitute, and she never heard him tell A.R. what to charge or "direct [her] prostitution appointments." Id.

It was not unreasonable for the state habeas court to hold that there was no evidence that Vasquez knew A.R. prostituted herself prior to meeting petitioner. On the day Vasquez and A.R. were discussing A.R.'s prostitution in the hotel room, A.R. was in a relationship with petitioner. Vasquez's declaration makes no mention of A.R. discussing that she was involved in prostitution before that time. Therefore, the state court's decision was not an unreasonable determination of the facts.

Second, petitioner argues that the state habeas court's finding that Alexander repudiated his declaration was contrary to the evidence presented. A private detective spoke with

---

[3] For the reasons stated above, petitioner's arguments that the state court improperly determined facts in dispute without an evidentiary hearing fail.

Alexander on two occasions and prepared a declaration for Alexander based on the investigator's

notes of their conversations. Dkt. No. 7-1, Cabero Decl. The declaration drafted for Alexander

to sign stated, among other things, that A.R. was "verbally and emotionally abusive and

manipulative" of petitioner; that A.R. hit petitioner, including one time when petitioner asked

A.R. to stop prostituting herself; that he believed that petitioner only drove A.R. to her

prostitution appointments because he was worried for her safety; and that he believed that A.R.'s

son was a result of her prostitution prior to meeting petitioner. Dkt. No. 7-1, Draft Alexander

Decl. Although this declaration was never signed by Alexander, a copy was emailed to him.

Dkt. No. 7-2, Riddlebarger Email. Alexander reviewed the draft declaration and stated that "he

never said about abuse" and that he "said that my sister has done it but I know she didn't know

what she was doing ...." Id. Alexander also said "[y]es I do agree but I don't agree what the

statement [] I said [sic]. I never signed as a final [sic]. But I never said that she got into for her

son [sic]. That is wrong." Id. Because Alexander stated that did not agree with, at a minimum,

several parts of the declaration, and he never signed it, the state court's finding that Alexander

repudiated the declaration was not an unreasonable determination of the facts.

Third, petitioner asserts that the state habeas court treated Anthony Fulton's declaration

"with inappropriate skepticism." Pet. at 29. Petitioner points to the fact that the state habeas

court noted that the declaration was "authored over a year and a half after" petitioner's offenses,

that Fulton's text messages only "purportedly" show A.R. engaged in prostitution, and that

Fulton's knowledge of A.R.'s prostitution was "nothing more than gossip and innuendo,"

without the benefit of an evidentiary hearing. Id. The evidence presented established that A.R.

suffered from mental illness, was unable to attend "regular" school, had borderline intellectual

functioning, and was declared by a court to be an incapacitated person. In light of all the

evidence presented, the analysis of Fulton's affidavit by the state habeas court was not an unreasonable determination of the facts.[4]

### ii. Unreasonable Application of Federal Law

Petitioner first claims that the state habeas court's decision was an unreasonable application of federal law because he is not barred from collaterally attacking his conviction just because he stated that he was satisfied with counsel at his plea hearing, and such a representation should not be held against petitioner "when he was unaware at the time of counsel's deficient performance." Pet. 29-30. Second, petitioner argues that the state habeas court's decision is contrary to Strickland because trial counsel's decision to advise him to plead guilty could not have been a strategic decision because it was not informed on any investigation. Id. 30-31. Finally, petitioner claims that the state habeas court used the wrong standard for determining whether there was prejudice under the Strickland standard because petitioner did not need to show that his sentence would have been lower or that he would not have been convicted, but rather he only needed to show that "the result of the proceeding would have been different – or in this case, whether [petitioner] would have chosen to go to trial." Id. at 31-32.

As to petitioner's first argument, the state habeas court did not hold that petitioner was barred from brining the ineffective assistance of counsel claims raised in Claim I of the instant petition because he stated that he was satisfied with trial counsel at the plea hearing.[5] As

---

[4] It is also noted that the trial court stated that any evidence of A.R. prostituting herself before and after her relationship with petitioner did not alter its findings of petitioner's culpability.

[5] The state habeas court did dismiss one of petitioner's ineffective assistance of counsel claims – that trial counsel's ineffective assistance of counsel regarding investigating his actual relationship with A.R. and A.R.'s prior prostitution rendered his guilty plea involuntary – "because petitioner failed to offer a valid reason shy he should not be bound by his representation at trial that his counsel's performance was adequate and that his guilty pleas were voluntary and there is no evidence identified by petitioner that would support the contrary

demonstrated above, the state habeas court evaluated each ineffective assistance of counsel claim raised in Claim I against the Strickland standard. Therefore, there was no unreasonable application of federal law. As to petitioner's second argument, nowhere in the state habeas decision is there a discussion that trial counsel's decision to advise petitioner to plead guilty was part of trial counsel's strategy. Therefore, this argument is inapposite.

Finally, petitioner's argument that the state habeas court used the wrong standard to evaluate whether petitioner was prejudiced by trial counsel's alleged ineffective assistance is not supported by the record. In evaluating the claims that make up Claim I of the instant petition, the state habeas court stated that "petitioner has failed to demonstrate that ... but for counsel's alleged errors, the result of the proceeding would have been different." Because the state habeas court used the exact standard petitioner states it should have used, its decision was not contrary to federal law.[6]

For the reasons stated above, the state habeas court's findings as to Claim I of the instant petition are neither contrary to, nor an unreasonable application of, existing federal law. Additionally, the state habeas court's determinations do not rest upon an unreasonable finding of fact. Accordingly, the state habeas court's rulings are entitled to deference and Claim I will be dismissed.

### B. Claim II

Petitioner's second claim is that his plea was involuntary because his trial counsel deprived him of any evidence about his case until more than a month after his plea hearing. Dkt.

_____

conclusion that the pleas were involuntary." Record No. 160684. However, this claim was not raised as part of Claim I in the instant petition.

[6] To the extent petitioner's claim is based on the argument that the state habeas court did not use the language "petitioner would have chosen to go to trial rather than plead guilty," such argument is insufficient to establish that the state habeas court's determination was contrary to federal law.

16

No. 1 at 32-33. Specifically, petitioner asserts that trial counsel did not (1) adequately inform him of the evidence against him until almost two months after his guilty plea; (2) properly advise him of the sentencing guidelines until a few days before sentencing, after petitioner pled guilty; and (3) inform him that he could withdraw his plea before sentencing. Id.

As an initial matter, petitioner's second and third arguments under this claim are procedurally barred. Before bringing a federal habeas petition, a state prisoner must first exhaust his claims in the appropriate state court. 28 U.S.C. § 2254(b). To comply with the exhaustion requirement, a state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Thus, a petitioner convicted in Virginia first must have presented the same factual and legal claims raised in his federal habeas corpus application to the Supreme Court of Virginia on direct appeal or in a state habeas corpus petition. See, e.g., Duncan v. Henry, 513 U.S. 364 (1995).

Petitioner did not argue, either in his direct appeal or his state habeas petition, that his plea was involuntary because trial counsel did not properly advise him of the sentencing guidelines until a few days before sentencing or that trial counsel did not inform him that he could withdraw his plea before sentencing. Therefore, these arguments were never presented to the Supreme Court of Virginia; however, they are nonetheless treated as exhausted because petitioner is now precluded from raising them in state court. See Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000) ("A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court."). Specifically, these arguments are procedurally defaulted under Virginia Code § 8.01-654(B)(2), which bars

successive state habeas applications. The Fourth Circuit has "held on numerous occasions that the procedural default rule set forth in § 8.01-654(B)(2) constitutes an adequate and independent state-law ground for decision." Mackall v. Angelone, 131 F.3d 442, 446 (4th Cir. 1997). Finally, federal courts may not review barred claims absent a showing of cause and prejudice or a fundamental miscarriage of justice, such as actual innocence. Harris v. Reed, 489 U.S. 255, 260 (1989). Because petitioner has made no such showing, these arguments may not be reviewed.

As to petitioner's assertion that his plea was involuntary because trial counsel did not adequately inform him of the evidence against him until almost two months after his guilty plea, the Supreme Court of Virginia dismissed this claim on the merits.

> [P]etitioner contends he was denied the effective assistance of counsel because counsel failed to share with petitioner "the development of his case, the evidence against him, or materials given to [counsel] in discovery." In support of this claim, petitioner cites the "Notes of Allison Powers," petitioner's trial counsel, purportedly dated January 22, 2015, which he contends prove counsel gave petitioner copies of discovery materials on that date, several weeks after petitioner entered his guilty pleas. Petitioner contends that, as a result of counsel's failure, he did not know the potential evidence against him and could not intelligently choose whether pleading guilty or going to trial was in his best interest, and this his pleas were not voluntary.

> The courts rejects this portion of [the claim]. Petitioner's allegation that counsel's notes show she provided him with a copy of the Commonwealth's discovery response subsequent to the entry of his guilty pleas is insufficient to overcome his representation at trial that his counsel's performance was adequate, that he fully understood the charges against him, that he had discussed the charges and their elements with counsel, that he understood what the Commonwealth was required to prove before he could be convicted, that he was pleading guilty because he understood the Commonwealth's evidence, which had been recited to the Court, and felt it was in his best interest to enter pleas of guilty rather than go to trial, and that his guilty pleas were voluntary. See Anderson 222 Va. 516, 281 S.E.2d at 888. Further, petitioner failed to proffer the note he contends supports his claim.

Petitioner argues that the state habeas decision was unreasonable and contrary to federal law because it "ignores the realities of the standard plea colloquy: it is routine, and asks the criminal defendant to make quick judgments about complicated subject matters they are unfamiliar with." Pet. at 33.

Accepting petitioner's argument would essentially render all plea agreements nullities. The Unites States Supreme Court has touted the benefits of guilty pleas and plea bargains and emphasized that

> [t]hese advantages can be secured, however, only if dispositions by guilty plea are accorded a great measure of finality. To allow indiscriminate hearings in federal postconviction proceedings … would eliminate the chief virtues of the plea system speed, economy, and finality. And there is reason for concern about that prospect. More often than not a prisoner has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea.

Blackledge v. Allison, 431 U.S. 63, 71 (1977). Thus, "the representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." Id. at 73-74. Declarations made "in open court carry a strong presumption of veracity," and "the subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." Id. at 74. Thus, absent clear and convincing evidence to the contrary, a defendant is bound by his representations at a plea colloquy concerning the voluntariness of the plea and the adequacy of his representation. Beck v. Angelone, 261 F.3d 377, 396 (4th Cir. 2001). Here, not only did petitioner state during his plea colloquy that he understood the evidence against him, the prosecutor proffered what the evidence against petitioner would have been had the matter gone to trial. Therefore, petitioner's claim that he did not know the evidence against him until two months after his guilty plea is incredible. Accordingly, the state habeas court's decision is neither contrary to, nor an

unreasonable application of, existing federal law.  Additionally, the state habeas court's determination does not rest upon an unreasonable finding of fact.  Therefore, the state habeas court's ruling is entitled to deference and Claim II will be dismissed.

## C. Claim III

In his third claim, petitioner argues that trial counsel was ineffective because of a conflict of interest.  Specifically, petitioner argues that, because the public defender's office was representing Alexander at the same time they were representing petitioner, trial counsel was unable to obtain evidence from Alexander that would impeach A.R.'s preliminary hearing testimony and go against the Commonwealth's theory of the case, "because of the danger of it affecting Alexander's case to contradict the Fairfax Police Department and the Commonwealth." Pet. at 35.  In other words, petitioner argues, due to the public defender's representation of Alexander, his trial counsel was limited in her representation of petitioner.  Id. at 36.

The state habeas court dismissed this claim, stating as follows.

> The Court holds that [this claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in Strickland.  Petitioner fails to provide any support for his suggestion that the prosecutor and the police would have retaliated against Alexander had he provided petitioner's counsel with information regarding his sister's prostitution or her relationship with petitioner. Further, petitioner fails to explain how such information, which did not relate to Alexander's own criminal proceedings, was confidential information that counsel could not disclose.  Indeed, petitioner's own exhibit shows petitioner's counsel and Alexander's did communicate regarding potential "dirt" Alexander could provide against A.R.  Finally, as previously stated, petitioner has failed to prove Alexander had any useful negative information about A.R.'s "previous prostitution and the true nature" of her relationship with petitioner.  Thus, petitioner has failed to establish either an actual conflict of interest or an adverse effect on counsel's performance.  See Mickens v. Taylor, 535 U.S. 162, 172 (2002).  Therefore, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

Petitioner argues that the state habeas court's decision is unreasonable and contrary to federal law because it contradicts Cuyler v. Sullivan, 446 U.S. 335 (1980) and its progeny, and because the state habeas court misunderstood petitioner's argument. Pet. at 36. Petitioner asserts that trial counsel had an obligation to "represent [Alexander's] best interests and not involve him as a witness against the Commonwealth when he had a case pending." Id. at 37. Petitioner also claims that the issue is not whether he is correct, but whether the representation of Alexander and petitioner could have created such a problem. Id.

Petitioner's argument is not supported by Cuyler.[7] "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 348. Thus, a mere possibility of a conflict adversely affecting trial counsel's performance is insufficient. Id. at 350 ("We hold that the possibility of conflict is insufficient to impugn a criminal conviction."). Petitioner speculates that his trial counsel did not obtain further information from Alexander because of the public defender office's duty in representing Alexander. In addition, there is no proof that not speaking with Alexander had an adverse effect on petitioner's trial counsel's performance because there is no proof that Alexander had information that would have helped petitioner. There is only an email sent by trial counsel suggesting that Alexander may have some "dirt" on A.R. and an affidavit Alexander never signed and stated was, at a minimum, partially false. Thus, the state habeas court's decision is neither contrary to, nor an unreasonable application of, existing federal law. Additionally, the

---

[7] It is also noted that Cuyler deals with multiple representation, where the same attorney represented co-defendants. Where, as here, the issue is not multiple representation, there is less of a risk that a conflict of interest would have an adverse effect on a lawyer's performance.

state habeas court's determination does not rest upon an unreasonable finding of fact. Therefore, the state habeas court's ruling is entitled to deference and Claim III will be dismissed.

## IV. Evidentiary Hearing

For the reasons stated above, the state habeas court's determination was a decision on the merits. Because the state habeas court decided petitioner's claims on the merits, an evidentiary hearing is not appropriate in this matter. Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); see also Landers, 776 F.3d at 1295 ("As best we can tell, every circuit court to consider this issue has held that the Pinholster restriction applies to § 2254(d)(2) claims, as well.") (collecting cases). Accordingly, petitioner's request for an evidentiary hearing will be denied.

## V. Conclusion

The state habeas court decided petitioner's claims on the merits, thus it is due the appropriate level of deference. Nothing in the state court record indicates that the state habeas court decisions were either contrary to, or an unreasonable application of, clearly established federal law, nor did those decisions involve an unreasonable determination of the facts. Accordingly, this petition will be dismissed, with prejudice, by an Order to be issued with this Memorandum Opinion. Finally, petitioner is not entitled to an evidentiary hearing, and his request will be denied.

Entered this 25ᵗʰ day of _____ Mar, _____ 2019.

_Claude M. Hilton_
United States District Judge

Alexandria, Virginia